JOHNNIE EDWARDS v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—108 S. W. (2d) 140.

Division Two, August 26, 1937.

*T. M. Pierce, J. L. Howell* and *Walter N. Davis* for appellant.

236

*C. I. Hoy, Wm. T. Powers* and *John W. Smith* for respondent.

WESTHUES, C.—Respondent, plaintiff below, obtained a judgment against appellant in the sum of $15,000, for personal injuries which plaintiff alleged he suffered in the railroad yards of the de-

fendant, in the city of St. Louis, Missouri. From the judgment defendant appealed.

At the trial the case was submitted to a jury under the humanitarian doctrine. Appellant preserved for our review the question of the sufficiency of the evidence to sustain the verdict of the jury. Since we have concluded that this contention of appellant must be sustained we need not refer to, or consider other assignments of error.

There was a sharp issue at the trial as to the exact location where, and the manner in which plaintiff was injured. Defendant introduced evidence that plaintiff and a number of his companions were in the railroad yards near Twenty-first Street, on the early morning of October 31, 1930; that one of the party shoved plaintiff against a moving train and that plaintiff fell under the train and lost his arm. The arm was found at that point. Plaintiff's evidence tended to prove that he was crossing Twenty-second Street over the railroad tracks when he was injured. We shall disregard entirely the evidence introduced by the defendant railroad as to the time and place of the accident and state the case as favorable to respondent as the facts permit. Plaintiff testified that on the morning of October 31, 1930, between the hours of six and seven, he attempted to cross the railroad tracks where they intersect Twenty-second Street, west of the Union Station. This street, a north and south street, had been closed, so far as vehicular traffic was concerned, by the construction of barriers at both sides of the tracks. Pedestrians, however, frequently crossed over the tracks. There was no walk constructed for pedestrians, they merely walked over the tracks. There were eight main line tracks running east and west, and of course, as is usual in railroad yards, there were switches at various points permitting trains to cross over from one track to another. These switches were operated by a man in a tower. The operators of trains were required to watch signal lights and proceed accordingly. The man located at the tower regulated the course of the trains. The tracks at Twenty-second Street were numbered from fifty-one to fifty-eight, inclusive. Plaintiff testified that as he was crossing these main line tracks from north to south, and when he reached a point about where tracks fifty-six or fifty-seven are located, a train of freight cars was moving slowly westward blocking his path. He stated that he waited for this train to pass and while thus waiting he noticed a passenger train, also moving westerly, approach upon a track immediately north of the track which was occupied by the freight train; that the passenger train was running at a speed of about five or six miles per hour. Plaintiff further testified that the engine of the passenger train passed him, but that the coal supply car or tender struck him on the right shoulder knocking him beneath the freight train cutting off his arm; that he was facing the freight train south of him.

Plaintiff's instruction, as given by the trial court, authorized a verdict for plaintiff upon the theory that if the operators of the train saw, or by the exercise of ordinary care could have seen, plaintiff in a position of imminent peril in time thereafter to have stopped the train, or to have sounded an audible warning signal, and by so doing could have avoided striking plaintiff, then a verdict for plaintiff was authorized. The humanitarian doctrine is not applicable unless the plaintiff was in a position of imminent peril. In the case before us plaintiff was not oblivious. He testified that he saw the passenger train coming; saw it switch over on the track next to the freight train when it was about sixty feet from him. He testified that he had lived in the neighborhood for a number of years and had crossed the tracks on numerous occasions. He had also worked for railroad companies, doing track work and knew that the switches in the yards were operated by a man in the tower. Mr. James M. Perry, a passenger train master, testified for plaintiff that the operators of the trains never knew which track their train would enter until they entered the switch; that as a rule these switches were so constructed that the train could be switched either north or south, and therefore it was possible, by throwing the switch, to lead the train onto any one of three tracks. A locomotive engineer testified as a witness for plaintiff that a train, such as plaintiff testified struck him, could be stopped within ninety to one hundred feet when running at a speed of six miles per hour. This witness also testified that the engine and tender would not rock; that a tender that rocked could not be used on the road. Plaintiff testified that the space between the track upon which the freight train was moving and the one upon which the passenger train was moving was sufficient to permit two persons to walk side by side without interference if the trains were standing still. Plaintiff's evidence with reference to the space between the tracks was substantially the same as that offered by the defendant railroad. Actual measurements showed that the space between a freight train and a passenger train standing upon adjoining tracks at the point in question was three feet and ten inches. The freight train, as plaintiff testified, was moving very slowly. The passenger train was traveling about five or six miles per hour. Plaintiff was, therefore, under the physical facts as shown by his own testimony, not in a position of imminent peril as that term is understood in connection with the humanitarian doctrine. The peril must be certain and not contingent. In State ex rel. v. Trimble, 300 Mo. 92, 253 S. W. 1014, l. c. 1019, this court said:

"The word 'peril' as used in the rule of 'discovered peril,' 'humanitarian rule,' or 'last chance doctrine,' means something more than a bare possibility of an injury occurring."

This rule was reaffirmed in a number of cases including Ridge v.

Jones, 335 Mo. 219, 71 S. W. (2d) 713, l. c. 714 etc. (1, 2); Ziegelmeier v. East St. Louis & Suburban Ry. Co., 330 Mo. 1013, 51 S. W. (2d) 1027, l. c. 1029 (1, 3); Huckleberry v. Mo. Pac. Railroad Co., 324 Mo. 1025, 26 S. W. (2d) 980, l. c. 983(1). In this case the evidence disclosed that the pilot beam on the engine was as wide as any part of the coal supply car or tender. Plaintiff testified that the engine passed him without injury. The query then presents itself that if plaintiff was injured as he testified he was, how did the accident happen? We think the following evidence by plaintiff fully answers this question:

"Q. And while you were facing the cars, under those circumstances then you were struck? A. Yes, sir.

"Q. And you were struck in the right shoulder? A. Yes, sir.

"Q. Now, can you tell me when you were facing south and with your right shoulder to the west and your left shoulder to the east, how could you be struck on the right shoulder? A. I don't know what condition I turned in.

"Q. You don't know what condition you turned in? A. No, sir, when I got between both trains.

"Q. You did turn then, did you? A. I turned some way.

"Q. You turned some way? A. Yes, sir."

Plaintiff was asked about his evidence on this point, given in a deposition. The record shows the following:

"Q. Was this question asked you—on page 41—'Well, what happened to you?' Answer, 'What happened to me? Oh, I was out of the distance of the freight cars going west, pushing west, and I don't understand how the passenger train hit me. It all happened just in a second; first thing I remember I come to myself I was running up the track.' Did you answer that way in your deposition? A. Yes, sir.

"Q. And that is true, is it? A. Yes, sir."

It will be noted that the passenger train, which plaintiff alleged struck him on the right shoulder, was traveling west and plaintiff stated he was facing south. Plaintiff, therefore, necessarily turned, otherwise it would have been impossible for the train to have struck him on the right shoulder. Also, had plaintiff not turned he would not have been struck. As to the space between the cars and the engine passing him plaintiff testified as follows:

"Q. Now, was this question asked you—page 31—'The pilot and part of the engine had already passed you before you were hurt?' A. 'Yes, sir.' That was your answer, 'Yes, sir.' And that is true, is it? A. Yes, sir.

"Q. The question was asked you, 'Was that when you noticed the name of it?' and you answered, 'I noticed the train when I seen it about 50 or 60 feet from me.' A. Yes, sir.

240

"Q. Now, that space in between the track on which the Missouri Pacific train was coming and the other track was wide enough for two men to walk in there, wasn't it? A. If the train is standing still; yes, sir.

"Q. If the train is standing still it was wide enough for two men to walk in there? A. If the train is standing still. . . .

"Q. That is, that place where you were standing at Twenty-second Street, as you say, you know that it was wide enough for two men to walk between the tracks without being hit if the cars were standing still? A. Yes, sir.

"Q. Now, you say that you knew that because you walked it? A. Yes, sir, I walked them tracks."

Plaintiff also testified that there was a switch in the tracks about sixty feet east of where he was standing; that the passenger train, when it reached the switch, crossed over from a track further north to the track immediately next to him and north of the track upon which the freight train was standing. Plaintiff, at the trial, testified that he knew he was in danger when the train moved onto the track next to him, but that he did not have time to cross over the track in front of the train. At another point in his examination he testified as follows:

"Q. . . . You could have gotten on this Terminal train it was going so slow, couldn't you? A. Yes, sir, I could have got on the train.

"Q. But you didn't do that? A. No, sir, I wasn't jumping trains.

"Q. How? A. No, sir, I didn't go down there to catch them.

"Q. You didn't get on the train to get out of the way as this came up there? A. No, it didn't come to me— I didn't use my head that quick.

"Q. Now, was this question asked you, 'And you thought you were safe?', and the answer, 'Yes, sir'? A. Yes, sir.

"Q. Question, 'Didn't think there was any danger there?' Answer, 'No, sir, I didn't—didn't think I was in no danger, thought I was out of distance of it.' You thought that, didn't you? A. Yes, sir.

"Q. And that was true, wasn't it? I say that was true, wasn't it? A. Yes, sir, it was.

"Q. You thought you were out of danger of this thing? A. Yes, sir.

"Q. And you thought you were safe where you were? A. Yes, sir.

"Q. Even though the Missouri Pacific train was coming along there you thought you were safe? A. Yes, sir.

"Q. How? A. Yes, sir, I thought I was safe."

It is argued that when plaintiff testified that he thought he was

safe he referred to the time before the passenger train switched over to the track next to the freight train. Be that as it may, plaintiff's conclusion that he was safe, or in danger, could not override the undisputed physical facts. Under his own evidence there was sufficient space between the trains for two people to walk side by side without touching the trains if they were standing still. The measurements taken support this evidence. A man standing between two trains moving slowly, as plaintiff's evidence in this case disclosed, would not be in a position of imminent peril, giving due allowance for the usual swaying of trains moving at that speed. Plaintiff not being in a position of imminent peril it follows that the humanitarian doctrine has no application.

Respondent briefed the point and has cited many cases upon the failure to warn. We cannot see how a failure to warn was material in this case even conceding, which we do not, that plaintiff was in a position of peril. Plaintiff saw the train coming when it was four hundred feet away. He saw it pass over the switch onto the track next to him. Obliviousness and failure to warn were, therefore, not in the case. [Pentecost v. St. Louis Merchants' Bridge Terminal Railroad Co., 334 Mo. 572, 66 S. W. (2d) 533, l. c. 535(3).] A discussion of this question is, however, immaterial, since we have ruled that plaintiff's evidence failed to establish a case under the humanitarian doctrine.

The judgment is reversed. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.