MABEL BATES v. BROWN SHOE COMPANY, a Corporation, Appellant.— 116 S. W. (2d) 31.

Division Two, May 3, 1938.*

---

*NOTE: Opinion filed at September Term, 1937, December 17, 1937; motion for rehearing filed; motion overruled at May Term, 1938, May 3, 1938.

412

*Hunter & Chamier, T. R. McGinnis* and *Moser, Marsalek & Dearing* for appellant.

*Hulen & Walden* for respondent.

WESTHUES, C.—Respondent, Mable Bates, obtained a judgment in the sum of $10,000, against appellant, Brown Shoe Company, as damages for the death of her husband.

Appellant has briefed a number of points upon which a reversal of the judgment is sought, among them, that the evidence was insufficient to sustain the judgment. The case was submitted to a jury solely under the humanitarian rule. Since we have concluded that appellant's contention, above mentioned, must be sustained, other points need not be considered. We will attempt to state the case as favorable to plaintiff as the evidence justifies. Plaintiff's husband, whom we will refer to as the deceased, met his death on January 7, 1935, at about 11:30 P. M., on Highway 63, about a quarter of a mile north of Renick and a few miles south of Moberly, Missouri. Highway 63, at this point, consists of a concrete slab eighteen feet wide with an earth shoulder on each side about six or seven feet in width. The night in question was dark, rainy and foggy. Jean Crumpler and Leslie Dees were truck drivers for the appellant shoe company. They were both made defendants in the case, but plaintiff dismissed as to them at the close of her evidence. These truck drivers made regular nightly round trips, with loads of freight, between St. Louis and Moberly. The trucks consisted

of a tractor and trailer and when loaded weighed about twenty-five thousand pounds. The front wheels of the tractor were single wheels and the rear dual. The front end of the trailer, when enroute, rested upon the tractor over the dual wheels, and the rear end of the trailer was supported by a set of dual wheels. These trucks were about thirty-four feet in length. On the night in question the trucks left Moberly shortly after eleven-thirty P. M., with Crumpler in the lead and Dees following at a distance of about one hundred feet. Following these trucks at some distance was a third truck of similar construction, belonging to the Missouri Relief Association and driven by one Victor Hooper. The three truck drivers were called by plaintiff as witnesses. Crumpler testified that as he was going south on the highway, at a speed of about twenty miles per hour, he noticed a man riding a horse south along the west side of the pavement; that he swerved to the left and passed; that after he had passed a short distance Dees signaled with his lights to stop and he did so. He testified that Dees informed him that he, Dees, thought the horse had thrown the man. Not wanting to stop on the pavement they drove their trucks about a quarter of a mile south to a filling station, then started to walk north. Dees testified that he was following Crumpler's truck at a distance of about one hundred feet when he noticed Crumpler's truck swerve to the left; that he also began to turn to the left; that he saw the man and horse on the shoulder to the west of the concrete just as Crumpler's truck passed them. Dees further stated that there was nothing unusual happened until he was about even with the horse and rider; that then he noticed the horse rear upon its hind legs; that at that time his truck was on the east side of the pavement. He also stated that he signaled for Crumpler to stop; that his purpose was to see if the horse had thrown the rider, and if so to render whatever aid was necessary. Hooper, the driver of the relief truck, testified that he was driving south on the highway when he noticed an object ahead of him lying on the west side of the pavement; that he slowed down his truck a little and turned to the left to avoid striking this object and then noticed another object lying on the east side of the road; that it was then too late for him to stop so he attempted to drive his truck between the two objects, but was unable to do so; that the dual wheels of the tractor passed over the rump of the horse, but that the tractor did not run over the deceased. Hooper further testified that neither of the objects moved as he approached them. The east wheels of Hooper's truck passed over the shoulder of the roadway east of the pavement and south of where the horse and deceased were found. The truck was stopped some distance south on the west side of the highway. By this time Crumpler and Dees arrived. Crumpler, Dees, Hooper and Dr. C. C. Smith, who happened to be traveling

north, went to the scene and found deceased and his horse on the pavement, both dead. The horse was lying on the west side of the pavement upon her left side with feet toward Moberly and head to the southwest. The rear end of the horse was about eighteen inches from the center line of the pavement. The deceased was lying on the east side of the road with his head toward Moberly. His head was about four feet from the center line of the road and his feet about eighteen inches therefrom. The feet of the deceased were about opposite the rump of the horse. An examination disclosed that at least one of the truck wheels had passed over the rump of the horse. The horse had also sustained an injury to its head. The deceased's body disclosed that truck wheels had passed over his right arm, shoulder and his chest. Another set of dual wheels had passed over his legs below the knees. It had been raining, and witnesses testified that tracks of truck wheels were traceable from deceased's body to the place where Hooper's truck was standing. The position of the horse and deceased upon the pavement was such, that if the right dual wheels of Hooper's truck passed over the rear end of the horse, then the left wheels of the truck must have passed over deceased's body. This truck was thirty-four feet long with three sets of wheels. The distance between the wheels, from side to side, was about four feet. When Hooper turned to the left, or east, in an attempt to pass between the objects in the road the rear wheels naturally would not follow the tracks made by the front wheels, but would pass to the east. Thus, the physical facts disclose that Hooper's truck wheels must have passed over the deceased.

A Missouri State Highway Patrolman appeared upon the scene, and also a coroner's jury which had been summoned. The coroner's jury and the patrolman made a thorough examination of all three trucks. Not the slightest evidence was found upon either of defendant's trucks to indicate that they had come in contact with deceased or the horse. Hooper's truck disclosed that the right front bumper and the right front and rear fenders were bent back. The crank, which is used to lower and raise the dolly wheels of the trailer, was bent, and horse hair and blood were found at various places upon this truck. An examination of the west shoulder of the highway disclosed horse tracks beginning about fifteen feet north of where the horse was lying and extending north for a distance of more than one hundred and fifty feet.

Plaintiff was permitted, over appellant's objection, to introduce evidence of a statement, alleged to have been made by Crumper to Dees at the scene of the accident, of the following tenor, ''I missed him; I guess you must have caught him with your trailer,'' and also evidence that Dees made no response. This was alleged to have occurred immediately after the truck drivers and Dr. Smith ar-

418

rived at the scene of the accident. It was also shown that during this time no other trucks or cars passed either north or south.

■ The question before us then is, whether the facts above stated are sufficient to sustain the judgment. Facts necessary to sustain a recovery in a civil case may be proven by circumstantial evidence, but the facts and circumstances proven must be such that the necessary facts to support a verdict may be inferred and must reasonably follow. Such evidence must exclude guess work, conjecture and speculation as to the existence of the necessary facts. [22 C. J. 65, sec. 8; Fritz & Groh v. St. Louis, I. M. & S. Railroad Co., 243 Mo. 62, 148 S. W. 74, l. c. 78.]

For plaintiffff to recover in this case it was incumbent on her to prove, among other facts, that one of defendant's trucks struck the deceased, or the horse, and also that the deceased was in a position of imminent peril, as that term is understood under our humanitarian doctrine. We do not think that the evidence in this case justifies the inference that the deceased, or the horse, was struck by one of defendant's trucks. It is just as logical, if not more so, to infer from the facts proven that the horse became frightened, or for some reason became unruly, and because of the wet payement slipped and fell and injured his head; that at the same time the deceased was thrown to the pavement; that the truck driven by Hooper, then passed over them. Whether plaintiff's husband and the horse were dead, or only stunned, prior to the time Hooper's truck passed over them, will never be known. The fact that the trucks of the defendant did not disclose even the slightest mark of having come in contact with the deceased or the horse was a strong circumstance corroborative of Dees' evidence that his truck did not strike the rider or the horse, but that as he passed the horse reared. We have here a state of facts where a reasonable mind might conjecture that one thing happened, another that something else happened and a third might not agree with either. Sound reasoning, however, does not point to the liability of the defendant to the exclusion of other causes. A verdict cannot be sustained by such evidence. [See Fritz & Groh v. St. Louis, I. M. & S. Railroad Co., supra.]

■ But even though, per chance, we are wrong in this conclusion, the judgment cannot be sustained because the evidence wholly failed to show that the deceased was in a position of imminent peril, or that the drivers of defendant's trucks were negligent. Plaintiff, by her evidence, showed that the horse and rider were going south, and the evidence most favorable to plaintiff was that the horse was walking an ordinary gait on the line of the pavement and the west shoulder. There was no traffic upon the highway at the time, except the defendant's trucks going south at about twenty miles per hour. We ask, where was there any imminent peril? That the

first truck passed without injuring the horse or its rider was proven without doubt. The driver of the second truck, Mr. Dees, when upon the witness stand for plaintiff, testified as follows:

"Q. After you saw Mr. Bates by your lights, on the horse on the right side of the pavement, tell the jury whether or not, under the conditions as they existed there that night, with the equipment you had, if you had plenty of time, if you so desired to do it, to stop your truck with safety to yourself and to your load before you got to Mr. Bates? A. I could have, yes.

"Q. Tell the jury, under the conditions existing that night, after you saw Mr. Bates and his horse, if you had plenty of time, with safety to yourself and load, to turn your truck to the east side of the pavement and pass him? A. I did; yes, sir.

"Q. You had ample time to do that? A. Yes, sir.

"Q. What was the rate of your speed? A. Around twenty miles an hour at the time I saw Mr. Bates.

"Q. What was the condition of the weather there? A. Foggy.

"Q. Could you form an idea how far back it was to the knoll of that little hill north of where Mr. Bates was struck? A. I would say possibly five or six hundred feet—something like that.

"Q. Did you see Mr. Bates' horse shy there that night—rear? A. As I was passing, yes, sir; he reared on his hind legs with his front feet up in the air.

"Q. How many times did he rear? A. Once is all I saw as I was passing. He was on the road shoulder.

"Q. Was he even with your truck? A. Well, as much as I could see out of the windshield, he would be almost opposite the cab, by the reflection of the lights.

"Q. In other words, the front part of your truck was past him, and he was about even with where you were sitting in the truck? A. Approximately that; yes, sir.

"Q. Whereabouts was your truck? A. On the left side of the slab, going south, when I saw him rear."

There was no evidence introduced at variance with the evidence just quoted. The physical facts, as shown by the evidence, tended to support rather than contradict the evidence of Dees. The statement alleged to have been made by Crumpler to Dees, "I missed him; I guess you must have caught him with your trailer," even if admissible, would not add sufficient material to the evidence to make a case under the humanitarian doctrine. The statement, if made, was merely an expression of an opinion. The only statement of fact contained therein is, "I missed him." We have consistently ruled that "imminent peril" means more than a possibility of injury to the person affected. In State ex rel. v. Trimble et al., 300 Mo. 92, 253 S. W. 1014, l. c. 1019, this court said:

420

"The word 'peril' as used in the rule of 'discovered peril,' 'humanitarian rule' or 'last chance doctrine' means something more than a bare possibility of an injury occurring."

The peril must be certain and imminent and the defendant must have been able to have discovered such peril. [Banks v. Morris & Co., 302 Mo. 254, l. c. 273, 257 S. W. 482; Ziegelmeier v. East St. Louis & Suburban Ry. Co., 330 Mo. 1013, 51 S. W. (2d) 1027, l. c. 1029 (2-3); Ridge v. Jones, 335 Mo. 219, 71 S. W. (2d) 713; Edwards v. Terminal Railroad Assn. of St. Louis, 341 Mo. 235, 108 S. W. (2d) 140.] We think it is apparent that the evidence wholly failed to show that deceased was in a position of peril at the time the defendant's trucks were approaching, or that defendant's truck drivers were negligent.

The judgment is, therefore, reversed. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.

*NOTE: Opinion filed at September Term, 1937, December 17, 1937; motion for rehearing filed; motion overruled at May Term, 1938, May 3, 1938.